# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### WHEELING

NANCY A. LILLY,

        **Plaintiff,**

v.                                     **Civil Action No.: 5:10-CV-65**
                                                   **JUDGE STAMP**

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [21], DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11], AND AFFIRM THE RULING OF THE COMMISSIONER

## I.  INTRODUCTION

On June 14, 2010, Plaintiff Nancy A. Lilly ("Plaintiff"), by counsel Montie VanNostrand, Esq., filed a Complaint to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g).  (Complaint, ECF No. 1)  The case was referred to this Court to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a).  28 U.S.C. § 636(b)(1)(B); N.D.W.V. LR Civ P 9.02(a).  On August 16, 2010, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings.  (Answer, ECF No.

7; Administrative Record, ECF Nos. 8, 9)  On September 15, 2010, the Plaintiff filed her Motion

for Summary Judgment.  (Pl's Motion, ECF No. 11)  On November 12, 2010, the Commissioner,

upon motion, filed an Amended Administrative Record of the proceedings.  (Motion to Substitute

Transcript, ECF No. 16; Amended Record, ECF Nos. 17, 18)  On November 12, 2010, the

Commissioner filed his Motion for Summary Judgment.  (Def.'s Motion, ECF No. 21)  Following

review of the motions by the parties and the administrative record, the undersigned Magistrate Judge

now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

**A.**      **Procedural History**

1.      Plaintiff's First Application For Disability Insurance Benefits

On March 17, 2004, the Plaintiff filed an application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 et seq., alleging disability since

December 15, 2001, due to high blood pressure, thyroid disease, depression, panic attacks,

endometriosis, adhesions, agoraphobia, and anxiety.  Lilly v. Astrue, No. 5:07CV77, 2008 WL

4371499, at *1 (N.D.W.Va. Sept. 22, 2008).  This application was denied at the initial and

reconsideration levels.  Id.  The Plaintiff requested a hearing, which was held before an

Administrative Law Judge ("ALJ") on September 22, 2005.  Id.  On April 3, 2006, the ALJ issued

a decision finding that the Plaintiff was not disabled, and the Appeals Council subsequently denied

the Plaintiff's request for review.  Id.  The Plaintiff then filed an action to seek judicial review of

the Commissioner's decision.  Id.

The case was referred to United States Magistrate Judge James E. Seibert, and the parties filed cross-motions for summary judgment. Lilly, 2008 WL at *1. Magistrate Judge Seibert, after considering the parties' motions, submitted a report and recommendation finding that the Commissioner's decision to deny the Plaintiff's claim was proper because:

(1) substantial evidence supported the ALJ's conclusion that the Plaintiff's mental impairments did not meet the criteria of Listing 12.04C;

(2) the ALJ sufficiently considered, and reasonably assigned, limited weight to reports by Mr. Morrello; and

(3) the ALJ adequately documented his consideration of the evidence and the weight he accorded it.

Id. Magistrate Judge Seibert recommended that the court grant the Commissioner's motion for summary judgment, deny the Plaintiff's motion for summary judgment, and affirm the Commissioner's decision denying the Plaintiff's DIB application. Id. After the Plaintiff filed her objections to Magistrate Judge Seibert's report and recommendation, the court, in a memorandum opinion and order issued by District Judge Frederick P. Stamp, Jr., found that the Plaintiff's objections lacked merit and that the remainder of Magistrate Judge Seibert's report and recommendation was not clearly erroneous. Id. at *5. Accordingly, the court granted the Commissioner's motion for summary judgment and dismissed the Plaintiff's case. Id.

 2. Plaintiff's Present Application for Disability Insurance Benefits

On May 1, 2006, less than one month after the ALJ issued an unfavorable decision in her first claim, the Plaintiff filed a second DIB claim alleging disability beginning December 15, 2001.

(R. at 114-18)  The Plaintiff's second claim was initially denied on September 29, 2006, and denied

again upon reconsideration on January 31, 2007.  (R. at 77-78)  On March 19, 2007, the Plaintiff

filed a written request for a hearing, which was held before an ALJ on May 15, 2008, in

Morgantown, West Virginia.  (R. at 23- 55, 96-97)  On August 18, 2008, the ALJ issued an

unfavorable decision to the Plaintiff, finding that she had not been under a disability within the

meaning of the Social Security Act through December 31, 2007, the date last insured.  (R. at 8-22)

On April 30, 2010, the Appeals Council denied the Plaintiff's request for review, making the ALJ's

decision the final decision of the Commissioner.  (R. at 1-5)  The Plaintiff now requests judicial

review of the ALJ decision denying her application for DIB.

## B.   <u>Personal History</u>[1]

Plaintiff Nancy A. Lilly was born on April 2, 1968, and was 39 years old on December 31,

2007, the date last insured.  (<u>See</u> R. at 133)  She graduated from high school in 1986, and worked

from 1987-2001 as a bank teller, taking deposits and withdrawals and opening new accounts.  (R.

at 138, 143)  On December 15, 2001, she stopped working due to pregnancy, and although she

---

[1] As an aside, the Plaintiff's brief was difficult to follow due to her departure from the normal citation format used for references to an appellate record.  Rather than cite to the page numbers given in the record, the Plaintiff referenced the page numbers used by CM/ECF after the original document was subdivided into attachments; for example, page 132 of the record is cited by the Plaintiff as "Doc 8-2 p. 32," referring to docket number 8, attachment 2, page 32. Although the Court was able to locate most of her citations, the Court requests that the Plaintiff conform future filings to the more traditional format required by LR Civ P 9.02(g) and detailed in Rule B7 of the Bluebook.  <u>See</u> N.D.W.V. LR Civ P 9.02(g); The Bluebook: A Uniform System of Citation R. B7, at 19-22 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010) ("Bluepages Tip: Documents filed on PACER are imprinted with an ECF header, placed either at the top or bottom of each page.  These page numbers are sometimes different from the page numbers of the filed document; the pagination of the original document should be followed.").

returned to work for one month in 2007, she has primarily devoted her time since 2001 to caring for her children. (R. at 18, 27-28, 137, 150-51) She is married, and has both a son and a daughter. (See R. at 46-47)

## C.    **Relevant Medical History**

1.    Relevant Period Defined

As noted previously, the Plaintiff filed a prior DIB claim that was denied by the ALJ on April 3, 2006. (R. at 11) Although Plaintiff's current claim continues to assert disability since December 15, 2001, the ALJ found there was no basis to reopen the prior decision because the Plaintiff neither presented new and material evidence nor gave any other reason for reopening the case. 20 C.F.R. §§ 404.987-89 (2010); (R. at 12) This determination is not subject to review by this Court, and thus the prior decision is final and binding on the issue of disability through the date of April 3, 2006. See Califano v. Sanders, 430 U.S. 99, 108 (1977) ("[Section 405(g)] cannot be read to authorize judicial review of alleged abuses of agency discretion in refusing to reopen claims for social security benefits."). Therefore, the relevant period in the Plaintiff's current claim is from April 4, 2006, through December 31, 2007, the date last insured. However, any medical evidence post-dating December 31, 2007 may be considered to the extent it sheds light on the Plaintiff's condition prior to the date last insured. See Woodbridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987) ("[M]edical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability.").

2.    <u>Medical History Post-Dating April 3, 2006</u>[2]

The Plaintiff's medical history, for purposes of her second DIB claim, begins on May 23, 2006, when the Plaintiff was seen in the Braxton Community Health Center ER and diagnosed with bipolar disorder.  (R. at 377)  The treating physician also reported that the Plaintiff was in a poor mood, was worried about her mother, and was suffering panic attacks at night.  <u>Id.</u>

On June 22, 2006, the Plaintiff was seen by Dr. Sally Stewart for a followup examination. (R. at 376)  Dr. Stewart's diagnoses were psychogenic nausea, chronic pain, and bipolar disorder/obsessive-compulsive Disorder.  <u>Id.</u>

On June 28, 2006, the Plaintiff was evaluated by Dr. Jackson and diagnosed with chronic pain, depression, obsessive-compulsive disorder, and a possible body image disorder.  (R. at 375)

Dr. Stewart examined the Plaintiff on July 24, 2006, diagnosing her with chronic pain, bipolar disorder, and a narcotic addiction.  (R. at 374)

On August 8, 2006, the Plaintiff was examined by Dr. Larry J. Legg for a neuropsychological screening profile.  (R at 337-343)  Dr. Legg reported that the Plaintiff read off a list of mental health conditions that she believed to be suffering from, including "depression, bipolar, schizophrenia, obsessive compulsive disorder, and panic attacks."  (R. at 338)  The Plaintiff attributed her depression and bipolar disorders to postpartum depression; when asked about the symptoms of her schizophrenia, she informed Dr. Legg that "I can't tell you that, all I know is I've been diagnosed

---

[2] The background medical evidence pre-dating April 4, 2006, has already been thoroughly summarized by Magistrate Judge Seibert in his prior report and recommendation and accepted by the district court.  Judge Seibert's findings have been adopted and incorporated into this Court's report and recommendation but will not be reproduced herein.  <u>See generally</u> <u>Lilly v. Astrue</u>, No. 5:07CV77, 2008 WL 4371499 (N.D.W.Va. Sept. 22, 2008).

with it and I'm basically nuts."  Id.  Dr. Legg's report states that the Plaintiff was unwilling to elaborate further on the symptoms of these mental health complaints.  Id.  At the conclusion of the interview, the Plaintiff refused to shake Dr. Legg's hand, stating that "I can't do that, I have obsessive compulsive disorder.  I have to wipe the sink out five times, pillows have to be a certain way and I can't let my kids drink out of red straws."  Id.  Dr. Legg diagnosed the Plaintiff with bipolar disorder, borderline intellectual functioning, thyroid problems, high blood pressure, fibromyalgia, chronic pain, migraines, arthritis, and recurrent vomiting.  (R. at 343)  Dr. Legg reported that the Plaintiff's prognosis was fair, and opined that she was capable of managing her own finances.  Id.

On August 15, 2006, Dr. Frank Roman, a state agency psychologist, reviewed the evidence of record and completed a psychiatric review technique for the Plaintiff, diagnosing her with borderline intellectual functioning and bipolar disorder.  (R. at 346-359)  Dr. Roman determined that the Plaintiff did not meet the "B" criteria of Listings 12.02 and 12.04 because she only suffered from a mild degree of limitation in activities of daily living, moderate limitations in maintaining social functioning and concentration, persistence, or pace, and had suffered no episodes of decompensation of an extended duration.  (R. at 356)  He also determined that the evidence did not establish the presence of the "C" criteria for either listing.  (R. at 357)

Also on August 15, 2006, Dr. Roman completed a mental Residual Functional Capacity ("RFC") assessment, finding that the Plaintiff was only moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without

interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors. (R. at 360-363) Dr. Roman stated that these moderate limitations did not meet or equal a listing, that the medical evidence indicates she has improved in overall functioning, and that she is capable of performing routine one and two-step activities in a low stress setting. (R. at 362)

On August 18, 2006, the Plaintiff visited Dr. Doug Given of Braxton Health Associates as a new patient, complaining of abdominal pain, psychogenic vomiting, constipation, joint stiffness, joint pains, back pain, pain/anxiety, depression and anxiousness/stress, a blister on her left 4th finger, and wheezing. (R. at 617-623) Dr. Givens diagnosed the Plaintiff with bipolar affective disorder, depressed, in full remission; tobacco abuse, nondependent, use disorder; and hypertension, essential, unspecified. (R. at 622) Dr. Given recommended tapering off the Plaintiff's Xanax and Lorcet prescriptions; however, she advised him that she "is currently waiting for a reply from a disability claim adn [sic] would like to wait until then." (R. at 618, 623) Dr. Given's treatment notes indicate that, although the Plaintiff complained of depression, anxiousness/stress, there was no recent history of hyperventilation, prolonged insecurities, initial or fragmented sleep disturbances, inappropriate or excessive irritability, excessive or persistent indecisiveness, inappropriate shyness, visual, auditory, or tactile hallucinations, excessive use of alcohol, use of illicit drugs, suicidal ideation, persistent worrying, obsessive tendencies, manic depressive episodes or illness, diagnosed MPD, sexual dysfunctions, panic attacks, drug abuse, addictions or dependencies, or compulsive tendencies. (R. at 620)

On September 13, 2006, the Plaintiff was examined by Dr. Arturo Sabio of Tri-State Occupational Medicine, Inc. for a consultative physical examination. (R. at 364-369) Dr. Sabio reported that the Plaintiff has a history of schizophrenia, depression, bipolar disorder with mood swings, obsessive-compulsive disorder, migraine headaches, fibromyalgia, and endometriosis. (R. at 365) The Plaintiff denied kidney stones, hematuria, frequency, or dysuria. (R. at 365) She was well-developed, well-nourished, and oriented to time, place, and person. (R. at 366) She had tenderness over both shoulders, her hips, knees, the superior trapezius muscles, the scapular tips, and the lumbar muscles. (R. at 366) Dr. Sabio's diagnostic impression was bipolar disorder, predominantly depression, history of schizophrenia, fibromyalgia, obsessive-compulsive disorder, and migraine headaches. (R. at 368)

On September 28, 2006, Laurel Klein, a state agency medical consultant, reviewed the evidence of record and completed a physical RFC form. (R. at 156-165) Ms. Klein determined that the Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and had unlimited ability to push and pull or operate hand/foot controls. (R. at 159) The only limitations noted by Ms. Klein were that the Plaintiff should never climb ladders/ropes/scaffolds and should avoid even moderate exposure to hazards. (R. at 160-163) Ms. Klein disagreed with her treating physician's statement that the Plaintiff is disabled, noting that "the physical findings suggest that she is not that limited." (R. at 165) Ms. Klein determined that the Plaintiff's physical RFC should be reduced to medium work. Id.

The Plaintiff visited Dr. Given for a checkup on October 18, 2006, and reported having a

psychotic break the week before. (R. at 606) Dr. Given's notes report that the Plaintiff was "running around the house topless and husband had to get her back to bed. Opened up food, took son's comforter off bed. Was OK the next day. Last saw Dr. Attia at Buchannon. Thinks she is having more panic attacks in early AM." Id. Dr. Given's diagnoses were unchanged. (See R. at 610)

On October 26, 2006, the Plaintiff visited Dr. Stewart, who diagnosed her with amenorrhea, bipolar disorder, and chronic pain. (R. at 373) On November 9, 2006, Dr. Stewart diagnosed the Plaintiff with hyperprolactinaemia and amenorrhea. (R. at 372)

On November 11, 2006, Dr. Givens reported that the Plaintiff was worried about the holidays and was having more panic attacks. (R. at 599) For one week she limited her intake of Geodon to 80mg a day and had a mental break, acting "crazy that night." (R. at 599) The Plaintiff reported that she was having 3-4 panic attacks per day, and must run outside to catch her breath. Id. She also reported that she did not succeed in her SSI claim. Id.

On December 29, 2006, the Plaintiff visited Dr. Given reporting back pain, burning with urination, and pain in both of her legs. (R. at 587) The Plaintiff also reported that, due to the pain in her legs, she cannot sleep laying down but must instead sleep sitting up on her couch. Id. Dr. Given diagnosed the Plaintiff with a urinary tract infection, site unspecified. (R. at 591)

On January 19, 2007, Dr. Fulvio Franyutti, a state agency physician, completed a physical RFC assessment of the Plaintiff. (R. at 482-490) Dr. Franyutti determined that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour work day, sit about 6 hours in an 8-hour workday, and had unlimited ability to push and pull or

operate hand/foot controls.  (R. at 483)  Dr. Franyutti noted that the Plaintiff had occasional postural limitations, and should avoid concentrated exposure to extreme heat and cold, vibration, and hazards.  (R. at 484-486)  Dr. Franyutti determined that the Plaintiff was partially credible, but not all of her subjective complaints were supported by the medical evidence of record.  (R. at 487)  Dr. Franyutti noted his disagreement with Dr. Boyce's determination that the Plaintiff was unable to work due to physical and mental conditions, and instead agreed with the ALJ's statement and decision issued on April 3, 2006; he also noted that the April ALJ decision was not considered on the initial claim but should have been.  (See R. at 488-489)  Dr. Franyutti concluded that the Plaintiff was capable of light work with a sit/stand option.  (R. at 489)  Additionally, on January 25, 2007, Dr. Franyutti reviewed new medical evidence submitted by the Plaintiff, including "RFC & ALJ decision of 10/02/06," and found that no change in the Plaintiff's RFC was necessary.  (R. at 490)

On January 26, 2007, Dr. Joseph Kuzniar, another state agency psychologist, reviewed the evidence and completed a second psychiatric review technique form, diagnosing her with borderline intellectual functioning and bipolar affective disorder, in remission.  (R. at 492, 494)  He found that the Plaintiff failed to meet the "B" criteria of the listings because she had only mild limitations in activities of daily living, maintaining social functioning and concentration, persistence, or pace, and had no episodes of decompensation of extended duration.  (R. at 501)  He also determined that the evidence did not establish the presence of the "C" criteria.  (R. at 502)  Ultimately, Dr. Kuzniar found that the Plaintiff's medical impairments were not severe.  (R. at 491)

The Plaintiff visited Dr. Given on January 27, 2007, reporting nausea, vomiting, fever, sore throat, body aches, and back pain.  (R. at 581)  Dr. Given reported that the Plaintiff continued to

have burning during urination, increased frequency, and continued to urinate in small amounts.  Id.

On May 1, 2007, the Plaintiff was seen by Dr. Shelly Kafka of the UHC Rheumatology & Osteoporosis Clinic on a referral from Dr. Given for a rheumatological consultation.  (R. at 506)  Dr. Kafka found that the Plaintiff was positive for hypertension, nausea, constipation, difficulty urinating, pain and burning on urination, blood in urine, and headaches. (R. at 507, 509)  The Plaintiff also had a decreased range of motion in her lower lumbar spine, some tenderness in the MCP and PIP joints, a decreased range of motion in both hip joints, and some tenderness in the MTP joints.  (R. at 508)  Dr. Kafka believed that, given her symptoms, Dr. Given should rule out any evidence of an underlying inflammatory arthritis.  Id.

On June 13, 2007, Dr. Given's treatment records indicate that the Plaintiff had increased problems with her urinary tract, and was ordered by a urologist to self-catheterize to complete emptying of her bladder.  (See R. at 569)  She visited Dr. Given for a second opinion because she "doesn't want to have to catheterize for the rest of her life."  (R. at 568)  Dr. Given's report notes that the Plaintiff had been nervous, and was forced to quit her job at Tommy Hilfiger because of constant panic attacks.  (R. at 569)  Dr. Given's report also states that the Plaintiff's mental status is "anxious, OBVIOUSLY NOT ABLE TO WORK."[3]  (R. at 573)

Dr. Given's notes from July 9, 2007, state that the Plaintiff requested an appointment with a psychiatrist that conducts electroconvulsive therapy ("ECT").  (R. at 561)  On September 4, 2007, she reported to Dr. Given that she had an appointment at WVU to receive ECT. (R. at 555)

_____

[3] The remainder of Dr. Given's treatment records, dated from 7/9/2007-11/29/2007, contain this same assessment.  (See R. at 535-565)

On September 25, 2007, the Plaintiff was interviewed by Dr. Pamela Sullivan, a professor of behavioral medicine and psychiatry at the WVU school of medicine, for possible ECT treatment. (R. at 645-647) At the time of the evaluation, the Plaintiff was alert to time, person, and place. (R. at 646) The content of her speech was relevant and goal directed, she maintained good eye contact, and was pleasant and cooperative during the interview. Id. At times she appeared mildly anxious, but did not have a panic attack. Id. She stated that her mood was depressed, but she did not display any psychomotor agitation, no tremulousness, no suicidal or homicidal ideation, no auditory or visual hallucinations, and no delusional thoughts. Id. Her memory was intact. Id. She denied any phobias, obsessions, or compulsions. Id. Dr. Sullivan diagnosed her with depression, not otherwise specified, and panic attacks without agoraphobia. Id. Dr. Sullivan concluded that the Plaintiff's panic attacks were a higher priority in terms of immediate treatment than her depression, and advised her to begin medication and outpatient treatment at the Anxiety Disorders Clinic in order to address her anxiety symptoms. (R. at 647) At the time of the evaluation, Dr. Sullivan determined that ECT was not recommended, but that the Plaintiff could be referred back to the Mood Disorders Clinic for further evaluation of the need for ECT once her panic disorder is better treated. Id.

On October 1, 2007, the Plaintiff reported to Dr. Given that Dr. Sullivan did not recommend ECT but instead suggested a weekly anxiety class. (R. at 549) The Plaintiff told Dr. Given that she had been having bad panic attacks, but felt that the anxiety clinic would not help. Id. She also reported that she could not drive to either the anxiety clinic or the WVU anxiety class because of her panic attacks. Id.

On October 30, 2007, the Plaintiff requested that Dr. Given change her medication from

Imipramine to Seroquel because the Imipramine was not helping her rest or reducing her panic attacks. (R. at 542) She reported that her depression was about the same, and that she was having 3 panic attacks per day. Id. She reported a bad urinary tract infection, and had visited Dr. Demby for urinary retention problems. Id. Dr. Demby recommended she see "Dr. Lazlo at WVU"[4] for a spinal cord implant to help with emptying her bladder. Id. Dr. Givens noted that she had applied again for disability, that her lawyer wanted her to see Dr. Lazlo, and that she had an appointment. Id.

On November 29, 2007, Dr. Givens reported that the Plaintiff's depression was a lot worse, that the holidays depressed her, and that if it wasn't for her kids she would be in bed all day. (R. at 535) The Plaintiff reported that her urologist told her that she would have kidney failure if she didn't catheterize often, and wants her to have the spinal implant for emptying her bladder. Id. At this time, Dr. Given reported no urinary tract infection symptoms. Id.

3.    Medical Evidence Post-Dating December 31, 2007, the Date Last Insured

On April 9, 2008, Dr. Given completed a fibromyalgia questionnaire, stating that the Plaintiff met the criteria for fibromyalgia as defined by the American College of Rheumatology.[5] (R. at 668-

---

[4] The Court believes that "Dr. Lazlo at WVU" is in fact Dr. Stanley Zaslau, MD, a urologist with the WVU School of Medicine, Department of Surgery. Dr. Demby's report makes no mention of a Dr. Lazlo, but does mention Dr. Zaslau as a recommended surgeon for the spinal cord implant procedure. (R. at 730) It is likely that Dr. Given's notes simply reflect a phonetic misspelling of Dr. Zaslau's name.

[5] The fibromyalgia definition provided by the American College of Rheumatology and incorporated into the questionnaire is as follows:

History of widespread pain = pain on digital palpation must be present in at least 11 of the 18 tender points (shown on page 5 of this form) (must be a digital

682)  Dr. Given's report only lists tenderness in the trapezius muscle, with no indication of whether that pain is felt bilaterally or on one specific side.  (R. at 676)  Dr. Given also indicated that the Plaintiff suffers from chronic, frequent, severe pain, that her reported symptoms and limitations are consistent with her medical and psychological impairments, and that she would have severe limitations in dealing with ordinary work stress.  (R. at 678-679)  When asked if the Plaintiff needed a job that permitting shifting positions at will, Dr. Given replied that she is unable to work.  (R. at 680)  Dr. Given also stated that the Plaintiff could not sustain work at a full time job, and that she became disabled from full time employment due to fibromyalgia on December 15, 2001.  (R. at 682)

On May 2, 2008, the Plaintiff was referred by her attorney to Dr. Sharon J. Joseph for a psychological evaluation.  (R. at 683-689)  Dr. Joseph reported that the Plaintiff was alert, oriented x3, and cooperative, but her affect was flat and her mood appeared depressed.  (R. at 688)  Dr. Joseph also reported that the results of the MMPI-2 administered to the Plaintiff were not valid.  (R. at 687)  Dr. Joseph determined that, although the Plaintiff admitted to occasional mood swings and energy fluctuations, she did not meet the criteria for bipolar disorder at that time.  Id.  The Plaintiff reported panic attacks, paranoid delusions, and suicidal ideation without intent or plan, and stated that her primary care physician, Dr. Given, told her that her depression had been treatment-resistant

---

palpation with the force of 4kg)

Tender points are: Occiputal, bilateral; Low cervical, bilateral; Trapezius, bilateral; Supraspinatus, bilateral; Second rib, bilateral; Lateral epicondyle, bilateral; Gluteal, bilateral; upper and outer quadrants of buttocks and anterior fold of muscle; Greater Trochanger, bilateral and knee, bilateral.

(R. at 668)

and that she may need to have ECT. Id. Based on the information reported by the Plaintiff and observed by Dr. Joseph and her staff, the Plaintiff was diagnosed with major depression, recurrent, severe, with psychotic features; panic disorder without agoraphobia; obsessive-compulsive disorder; borderline intellectual functioning; migraines, fibromyalgia, hypertension, and thyroid disorder (per patient report); and psychosocial, financial, and vocational difficulties. (R. at 689)

On May 9, 2008, Dr. Joseph completed a psychiatric review technique form, finding that the Plaintiff met the "C" criteria for listings 12.04 and 12.06, and equaled the 12.05 listing due to borderline intellectual functioning. (R. at 696-706) Under listing 12.04, Dr. Joseph diagnosed the Plaintiff with depression marked by anhedonia, sleep disturbances, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. (R. at 699) Under listing 12.05, Dr. Joseph diagnosed the Plaintiff with borderline intellectual functioning. (R. at 700) Under listing 12.06, Dr. Joseph diagnosed the Plaintiff with anxiety marked by a panic disorder and obsessive compulsive disorder. (R. at 701) Dr. Joseph opined that the Plaintiff suffered moderate limitations in activities of daily living and maintaining social functioning; marked limitations in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of an extended duration. (R. at 704) Dr. Joseph also opined that the Plaintiff met the "C" criteria of Listing 12.04 because the Plaintiff suffered from a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate. (R. at 705)

Also on May 9, 2008, Dr. Joseph completed a mental RFC assessment worksheet. (R. at 691-695) Dr. Joseph opined that the Plaintiff had marked impairments in her ability to complete a

normal workday and workweek, relating predictably in social situations in the workplace, responding to changes in the work setting, being aware of normal hazards and taking appropriate precautions, setting realistic goals and making plans independently of others, traveling independently in unfamiliar places, and tolerating ordinary work stress. (R. at 691-694) Dr. Joseph attributed these impairments to borderline intellectual functioning, obsessive compulsive disorder, depression, and panic attacks. (R. at 691-694) Dr. Joseph stated that these impairments had existed since July 2002, the earliest time of onset identified by Dr. Attia's treatment records.[6] (R. at 694)

4.      Additional Medical Evidence Submitted to the Appeals Council

In support of her request for review of the ALJ decision by the Social Security Appeals Council, the Plaintiff submitted additional medical evidence from various physicians that treated her between May 24, 2007 and January 28, 2010. (R. at 5)

On May 24, 2007, the Plaintiff was treated by Dr. Frederick Martinez, a urologist with surgical associates of Charleston, for incomplete emptying of the bladder. (R. at 722-723) A cytoscopy showed that her bladder and her bladder neck were both normal, and a urodynamic study found no leakage with cough. Id. The Plaintiff had no urge at 400cc, and no detrusor contraction at 600ml, at which time she was catheterized for a post void residual of 600 cc. (R. at 723) She was instructed on intermitted catheterization since her primary problem was incomplete emptying, especially before going to bed. Id.

_____

[6] Dr. Attia originally treated the Plaintiff's psychological conditions in July of 2004, but reported that her symptoms began 2 years earlier. (R. at 694)  A summary of Dr. Attia's treatment notes can be found in the Report and Recommendation submitted by Magistrate Judge Seibert for the Plaintiff's previous disability claim. See Lilly v. Astrue, No. 5:07CV77, 2008 WL 4371499, at *5-23 (N.D.W.Va. Sept. 22, 2008).

On October 17, 2007, the Plaintiff was treated by Dr. Alan M. Demby for incomplete emptying of the bladder. (R. at 727-730) The Plaintiff reported a history of urinary tract infections, but stated that nothing tended to alleviate or aggravate her symptoms. (R. at 727) She denied chills, frequency, incontinence, clots with urination, and passing of stones or gravel. (R. at 727) Dr. Demby noted that her urethral meatus and body were within normal limits and normal to palpation, and her bladder was normal to palpation and without distention. (R. at 729) Dr. Demby's report states that the Plaintiff "seems like a good candidate for Interstim" and was referred to Dr. Zaslau for a possible Interstim implant. (R. at 730)

On May 12, 2008, Dr. Given performed an ultrasound on the Plaintiff's lower extremities, finding that there was no evidence of deep venous occlusion of either leg, but mild venous insufficiency existed bilaterally. (R. at 725)

On May 16, 2008, Dr. Given diagnosed the Plaintiff with constipation and rectal bleeding, and recommended a colonoscopy. (R. at 734-745)

On June 10, 2008, Dr. Ronald Pearson of Braxton County Memorial Hospital operated on the Plaintiff to repair a ventral hernia and perform a colonoscopy. (R. at 737-738) The colonoscopy revealed that the plaintiff had a moderate amount of sigmoid diverticulosis and somewhat poor prep. Id. No masses or polyps were visualized. Id.

On August 28, 2008, Dr. Jeffery C. Dameron of Braxton County Memorial Hospital performed a myocardial perfusion imaging of the Plaintiff. (R. at 758) He determined that the images showed some very mild nonspecific thinning of the lower anterior myocardium which did not persist at rest. Id. An exercise stress test performed on the same date was normal. (R. at 759)

On October 21, 2008, the Plaintiff was seen by Dr. John Goad of the Charleston Area Medical Center for a coronary evaluation. (R. at 765) A left heart catheterization, coronary angiography, left ventriculography, and aortic root angriography were performed. (R. at 766) The results of the evaluation showed that there was no radiographically demonstrable coronary artery disease, no evidence of aortic root dilation, dissection, insufficiency, or anomaly, normal LV contractility, and noncardiac chest discomfort. (R. at 767)

On September 29, 2009, the Plaintiff visited Dr. Given for pelvic pressure and pain, as well as documentation of a pressure sore for her disability claim. (R. at 798)

On October 12, 2009, the Plaintiff underwent an ultrasound of her thyroid, performed by Dr. Ronald Cordell of Braxton Imaging. (R. at 805) A nuclear thyroid scan was recommended Id. On January 28, 2010, a thyroid scan was completed by Dr. Timothy A. Conner of Braxton Memorial Hospital, who determined that the Plaintiff had low 24-hour uptake without focal abnormalities. (R. at 815)

D.    **Testimonial Evidence**

At the ALJ hearing held on May 15, 2008, the Plaintiff testified that she was born on April 2, 1968, and was 40 years of age at the time of the hearing. (R. at 27) She possessed a high school diploma, and had previously worked as a bank teller and loan secretary. Id. The Plaintiff claimed her onset date was December 15, 2001, but stated that she had a short work attempt in 2007 at the Tommy Hilfiger store, working 3 hours a week for approximately one month. (R. at 27-28) This work attempt ended because the Plaintiff could not be around so many people, and because of her panic attacks and obsessive compulsive disorder. (R. at 28) Additionally, the Plaintiff felt that she

could not take the amount of time required to catheterize without her employer becoming angry for spending time away from the counter.  Id.

The Plaintiff testified that she suffers from depression which, due to compulsive eating and side effects from medication, has caused her to gain weight.  (R. at 29)  She stated that she has thyroid problems, chronic migraines, uncontrolled vomiting, abdominal adhesions, fibromyalgia, high blood pressure, pain in her legs and back, bladder problems and infections, and possible underlying arthritis.  (R. at 30-39, 47-48)  She has had several headaches over the last six to eight months, and reported that while she has not had a bad vomiting incident in recent years, in the past she has been hospitalized due to dehydration from vomiting.  (R. at 31-32)  The Plaintiff has been treated for adhesions, but each laproscopic surgery creates more, causing pain that she described as painful stretching.  (R. at 33-34)

Concerning her bladder condition, the Plaintiff testified that she catheterizes every time she urinates, which is roughly four to five times per day.  (R. at 35)  She carries a kit containing antiseptic wipes, gloves, lubricant, and catheters for accomplishing this task, which can take several minutes if she becomes nervous.  (R. at 35-36)  She stated that she is very concerned about germs, and that she tries to use the handicapped stall in public restrooms so that she has room to lay out her supplies.  (R. at 36)  At Tommy Hilfiger she was unable to carry her kit without embarrassment because the store only allowed employees to bring in personal items if they fit into a small, store-issued plastic bag.  Id.  The Plaintiff has only suffered one bladder infection since beginning catheterization, and her bladder infections have been controlled with oral antibiotics.  (R. at 38-39)

As to her depression, the Plaintiff stated that she has tried every medication for depression

without success, and that her doctors have been exploring the possibility of ECT as a treatment option. (R. at 41-42) She also noted that her mother suffers from mental illness and has received ECT in the past. Id. The Plaintiff was treated for depression by Dr. Attia prior to the current relevant period, discontinuing treatment because she was unable to afford it. (R. at 42-43) Her primary care physicians continued to prescribe her the medications recommended by Dr. Attia. Id. She stated that she was unsuccessful in reducing this medication. Id.

The Plaintiff testified that she can stand for approximately 15-20 minutes and can sit for 30 minutes. (R. at 45) Standing causes her legs and back to hurt, and sitting causes her to get stiff; she stated that she is not comfortable anywhere except in bed. Id. She does not walk because she is too tired, but can walk for maybe 10 to 15 minutes without stopping. (R. at 46) She sometimes uses crutches to get out of bed at night. Id.

At the hearing, the Plaintiff specifically mentioned that she was taking Avinza (morphine) and Lorcet for migraine headaches, Lyrica for fibromyalgia, Byetta for weight loss, thyroid medication, blood pressure medication, and had taken Cymbalta for depression. (R. at 29-30, 36, 47) These medications cause nausea, drowsiness, and weight gain. (R. at 41)

Dr. Starosky, a vocational expert, also testified at the hearing on May 15, 2008. (R. at 49-54) In regard to the Plaintiff's ability to work in the regional or national economy, Starosky offered the following responses to the ALJ's questions:

> Q.    I'd ask you to assume a person of the claimant's age, educational background, and work history; who would be able to perform a range of light work; would require a sit/stand option; could perform postural movements occasionally, but could not kneel, crawl, or climb ladders, ropes, or scaffolds; should not be exposed to temperature extremes or hazards; should work in

a low-stress environment with no production line type of pace or independent decision-making responsibilities; would be limited to unskilled work involving only routine and repetitive instructions and tasks; should have no interruption with – interaction with the general public; and minimal, no more than occasional, interaction with coworkers and supervisors. Would there be any work in the regional or national economy that such a person could perform?

A.   Yes, Your Honor, and I'll define the local economy as 20 percent of all jobs in the state of West Virginia based on the Bureau of Labor Statistics. There would be the work of an office helper. In the local economy, there are 127 jobs; in the national economy, 162,282 jobs. There would be the work of a mail clerk. That would be an individual working in a mailroom of a private business, as opposed to working for the Postal Service. There are 86 jobs in the local economy, 82, 490 jobs in the national economy. There would be the work of a sewing machine operator. In the local economy, there are 70 jobs; in the national economy, 118,906 jobs.

Q.   And if you would reduce to sedentary, and retain the other limitations?

A.   Yes, Your Honor. There would be the work of a document preparer. In the local economy, there are 67 jobs; in the national economy, 62,756 jobs. There would be the work of a table worker. In the local economy, there are 13 jobs; in the national economy, 14,749 jobs.

Q.   And is anything in your testimony inconsistent with anything contained in the <u>DOT</u>?

A.   No, Your Honor, with the exception of the sit/stand option posed in the hypothetical. A sit/stand option's not defined in the <u>Dictionary of Occupational Titles</u>. My opinion regarding a sit/stand option is based on my having performed a job, having formerly analyzed a job, or having become familiar with how the job is performed otherwise.

(R. at 49-50) The Plaintiff's Counsel then examined Dr. Starosky, who provided the following

answers to her questions:

Q.   I'd like for you to assume that our hypothetical individual would need to miss three or more days per month, and I'm wondering if the hypothetical individual would be able to perform those jobs that you have identified.

A.     No, there would be no jobs for an individual missing three times per month on an ongoing basis.

Q.     All right.  I'd like for you to assume an individual who has a markedly limited ability to relate predictably in the workplace, and –

. . .

Q.     And this would be on a combination of things, but I'm concentrating right now on the emotional aspect of it, that this individual would be likely to experience mental symptoms that would cause her behavior to be considered not appropriate for the workplace, such as panic attacks, something like that. Would the individual be able to perform the jobs that you have identified?

. . .

A.     Yeah, I believe this individual would not be able to maintain employment.

Q.     Okay.  Now, I'd like for you to assume that our individual has a combination of mental and physical symptoms that would require frequent rest breaks. This may be for the purpose of using the catheter, or it might be just a number of interruptions that her health conditions, mental and physical, might cause, but this is going to require at least up to one-third to one-half the time, unscheduled additional breaks in excess of the normal break periods.  And I'm wondering if a person with, with that inability to comply with a normal break schedule, whether that would relate to these positions that you've identified.

. . .

A.     Right.  So, I would say that would, you know, prevent the person being able to sustain the normal levels of productivity.

Q.     Okay.  Let's see.  If we have an individual who's restricted to sedentary activity, but because of effects of fibromyalgia and other difficulties, that she's restricted from fine manipulation and grasping to about 10 percent of the workday, I'm wondering if there's any impact on the jobs that you've identified.

. . .

A.    Oh.  I think that would preclude the, the sedentary employment.

(R. at 50-53)

E.    **Lifestyle Evidence**

When interviewed by Dr. Joseph on May 2, 2008, the Plaintiff reported that she is able to make the bed, wash dishes, dust, cook a meal, iron clothing, remember to turn off the stove, drive a car, write checks and manage her finances, and take care of her daughter.  (R. at 687)  However, at the ALJ hearing on May 15, 2008, the Plaintiff testified that she is unable to do her own housework.  (R. at 44)  She further testified that on a very good day she may load the dishwasher, but her husband does all of the cooking and she is only able to prepare simple meals such as sandwiches and cereal for her daughter.  Id.  On normal days, she sleeps until 10:30AM, takes an afternoon nap, and then goes back to sleep after her husband gets home from work.  (R. at 46-47)  She also stated that she has no interest in taking care of her appearance, and has difficulty showering/bathing because she does not want to do anything.  (R. at 47)

### III.  CONTENTIONS OF THE PARTIES

The Plaintiff, in her motion for summary judgment, alleges that the decision of the ALJ is not supported by substantial evidence and should be reversed as a matter of law or, in the alternative, remanded to the Commissioner for correction of errors and a new hearing.  (Plaintiff's Motion, ECF No. 11)  Specifically, the Plaintiff believes that the ALJ's decision should be reversed because:

1.    the ALJ discounted the report of Dr. Joseph and relied on the opinions of non-examining State Agency psychologists without giving sufficient reasons for doing so;

2.    the ALJ improperly evaluated the background test data of the MMPI-2

conducted by Dr. Joseph by concluding, without the opinion of a medical expert as required by HALLEX, that the results indicated symptom magnification;

3. the ALJ's explanation as to why the Plaintiff fails to meet Listing 12.04C does not comply with the minimum requirements set forth by the Fourth Circuit in <u>Cook v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986);

4. the ALJ's conclusion that the Plaintiff's bladder condition was not severe is not supported by substantial evidence; and

5. the Appeals Council was incorrect in determining that the documentation provided regarding the use of a catheter was not new information providing a basis for changing the ALJ decision.

(Plaintiff's Support Brief 12-15, ECF No. 11)  In response, the Defendant argues in his motion for summary judgment that the ALJ's final decision denying the Plaintiff's claim for DIB is supported by substantial evidence and should be affirmed as a matter of law.  (Defendant's Motion, ECF No. 21)  Specifically, the Defendant argues that:

1. Dr. Joseph's opinion was inconsistent with her examination findings and the other evidence of record, including the opinions of Drs. Roman and Kuzniar, the Plaintiff's treatment history, and the Plaintiff's daily activities;

2. the ALJ did not improperly question Dr. Joseph's MMPI results and was not required to call an ME to opine on the underlying data because the ALJ accepted Dr. Joseph's report and interpretation of the MMPI without requesting or evaluating the data on which the report was based;

3. the ALJ properly supported his conclusion that Dr. Joseph's opinion was not credible by providing specific references to the evidence upon which his conclusion is based; and

4. the ALJ's conclusion that the Plaintiff's bladder condition was not a severe impairment at Step Two is supported by substantial evidence because the medical evidence of record and the Plaintiff's testimony at the ALJ hearing show that her condition had no more than a minimal impact on her ability to work and did not significantly limit her ability to perform basic work

activities for twelve consecutive months. Additionally, the Plaintiff failed to seek treatment with Dr. Zaslau for the corrective bladder procedure as advised, undermining the credibility of her claim that the condition is severe.

(Defendant's Memorandum in Support 14-24, ECF No. 22)

## IV. STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"[t]he language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

# V.  DISCUSSION

A.  **Standard for Disability and the Five-Step Evaluation Process**

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . .  "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A).  The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional

capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

**B.** **The Decision of the Administrative Law Judge**

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. **The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.** (R. at 13)

2. **The claimant did not engage in substantial gainful activity during the period from April 4, 2006, through her date last insured of December 31, 2007 (20 CFR 404.1520(b) and 404.1571 *et seq.*).** (R. at 14)

3. **Through the date last insured, the claimant had the following severe impairments: history of abdominal pain due to endometriosis and lysis of adhesions status post laparoscopic surgery in March 2006; diagnosis of fibromyalgia; very early and minor degenerative arthritis of the right knee; depressive disorder, not otherwise specified; borderline intellectual functioning; anxiety disorder, not otherwise specified; and panic attacks without agoraphobia (20 CFR 404.1520(c)).** (R. at 14)

4. **Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).** (R. at 16)

5. **After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the following residual functional capacity: she is able to perform a range of light work; requires a sitstand option; can perform postural movements occasionally except cannot kneel, crawl, or climb ladders, ropes or scaffolds; should not be exposed to temperature extremes or hazards; should work in a low-stress environment**

with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; and should not have any interaction with the general public and no more than occasional interaction with supervisors and co-workers. (R. at 17)

6. **Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).** (R. at 20)

7. **The claimant was born on April 2, 1968, and was 39 years old, which is defined as a younger individual, on the date last insured (20 CFR 404.1563).** (R. at 20)

8. **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).** (R. at 20)

9. **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).** (R. at 20)

10. **Through the date last insured, considering the claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).** (R. at 20)

11. **The claimant was not under a disability as defined in the Social Security Act, at any [time] through December 31, 2006, the date last insured (20 CFR 404.1520(g)).** (R. at 21)

**C.** **Substantial Evidence Supports the ALJ's Decision to Discount the Opinion of Dr. Joseph and Rely on the Opinions of the State Agency Psychologists Because Dr. Joseph's Opinion is Inconsistent With Her Objective Findings and Other Psychological Evidence in the Record**

As her first assignment of error, the Plaintiff contends that the ALJ erred in determining that

Listing 12.04C was not met because he relied on the opinions of the State agency psychologists and

discounted the opinion of Dr. Joseph without providing adequate reasons for doing so. (Pl.'s Supp.

Br. 12-14, ECF No. 11)  In response, the Defendant argues that the ALJ's opinion is supported by substantial evidence because Dr. Joseph's opinion was inconsistent with her examination findings and the other evidence of record, including the opinions of other medical experts on record.  (Def.'s Mem. 14-18, ECF No. 22)

Generally, the opinions of treating physicians and psychologists are given more weight in the disability determination because these sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . ."  20 C.F.R. § 404.1527(d)(2).  The opinion of a treating source will be given controlling weight if that opinion is: 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) is not inconsistent with the other substantial evidence in the record.  Id.  If a treating source opinion is not given controlling weight, the Social Security Administration weighs the following factors in determining the amount of weight to assign to the opinion:

- the length of the treatment relationship and the frequency of examination;

- the nature and extent of the treatment relationship;

- the extent to which the treating source presents relevant evidence to support his or her opinion;

- the consistency of the opinion with the medical evidence of record;

- the degree of specialization of the treating source; and

- any other factor which may be relevant, including the amount of understanding of the disability programs and their evidentiary requirements.

20 C.F.R. § 404.1527(d)(2)-(d)(6) (2010); see also Johnson v. Barnhard, 434 F.3d 650, 654 (4th Cir. 2005) (listing factors to be used in weighing and evaluating medical opinions). The ALJ is required to indicate the weight given to all relevant evidence. Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984). However, the ALJ is not required to discuss every piece of evidence. Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).

Upon review of the record, the ALJ did not err in assigning little weight to Dr. Joseph's PRTF because her conclusion was not well-supported by clinically acceptable diagnostic techniques and was inconsistent with other substantial evidence in the record. First, the results of the objective diagnostic techniques performed by Dr. Joseph fail to support her conclusion that the Plaintiff meets the "C" criteria of Listing 12.04. Although the Plaintiff scored in the borderline intellectual functioning range on the WAIS-III and WRAT-III assessments, this diagnosis was listed by Dr. Joseph under 12.05 and was not the basis for her opinion that the Plaintiff met the "C" criteria of 12.04. (See R. at 686, 705) Although the Plaintiff's Cognistat assessment indicated that she had moderate impairment in constructional abilities and severe impairment in judgment, Dr. Joseph acknowledged that the results of the test were not consistent with scores on previous Cognistat assessments or her score on the comprehension subtest of the WAIS-III assessment, which measures judgment and was within normal limits. (R. at 687) The Plaintiff's MMPI-2 examination, the only other objective test used by Dr. Joseph, was invalid due to the validity scales, and Dr. Joseph offered no additional explanation of the validity scales or any mention of the scores from the substantive MMPI-2 inventories. Id. Second, substantial evidence in the record conflicts with Dr. Joseph's

assessment; two different state agency psychologists both opined that the Plaintiff did not meet the "C" criteria and, as noted by the ALJ, both Dr. Joseph's evaluation and Dr. Sullivan's evaluation indicate that the Plaintiff has no more than moderate functional limitations. (R. at 346-359, 360-363, 645-647) Additionally, the ALJ properly weighed Dr. Joseph's opinion pursuant to the factors outlined in the regulations; as noted by the ALJ, Dr. Joseph's evaluation was a "one-time purchased psychological consultative evaluation," the evaluation itself did not support the ultimate conclusions drawn from it, and her opinion stood in contrast to two separate psychological opinions from specialists that "have an understanding of the disability programs and their evidentiary requirements." (R. at 14, 17) Because the objective evidence of record fails to support Dr. Joseph's conclusion, the undersigned Magistrate Judge finds that substantial evidence supports the ALJ's decision to not assign Dr. Joseph's opinion controlling weight.

**D.**     <u>**The ALJ Was Not Required to Call a Medical Expert to Determine That the Plaintiff's MMPI-2 Results Were Invalid Because he Did Not Request or Interpret the Underlying "Raw" Test Data**</u>

As her second assignment of error, the Plaintiff believes that the ALJ erred in determining that Listing 12.04C was not met because he stated in his decision that Dr. Joseph ignored significant symptom magnification when she interpreted the Plaintiff's MMPI-2 examination. (Pl.'s Supp. Br. 14, ECF No. 11) The Plaintiff believes that the ALJ was required by the Hearings, Appeals and Litigation Law Manual ("HALLEX") to call a medical expert to make this determination. <u>Id.</u> The Defendant in turn argues that the ALJ did not improperly question Dr. Joseph's MMPI-2 results and was not required to call an ME because he accepted Dr. Joseph's MMPI-2 report without requesting or evaluating the underlying data on which those results were based. (Def.'s Mem. 18-20, ECF No.

22).

According to the HALLEX manual, the ALJ must obtain a medical expert's opinion, either in testimony at a hearing or in responses to written interrogatories, to evaluate and interpret background medical test data. SOCIAL SECURITY ADMINISTRATION, OFFICE OF DISABILITY ADJUDICATION AND REVIEW, HALLEX HEARINGS, APPEALS, AND LITIGATION LAW MANUAL I-2-5-34 (2010). HALLEX lists "raw" test data, such as answer sheets or drawings, as examples of background medical test data from psychological test reports. Id. at I-2-5-14.

At the outset, the Court notes that the Fourth Circuit has not addressed whether a violation of HALLEX rules constitutes reversible error. Only the Fifth and Ninth circuits have addressed the issue, and they disagree in their conclusions. Compare Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (holding that HALLEX is not binding on the Commissioner and allegations of noncompliance with the manual are not reviewable) with Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000) (holding that a violation of HALLEX is only reversible error if the Plaintiff can demonstrate prejudice resulting from the violation). Despite their disagreement on the reviewability of a violation of HALLEX rules, both the Fifth and the Ninth Circuits have determined that HALLEX is merely an internal agency procedure manual that does not carry the force of law. See Moore, 216 F.3d at 868-869 ("HALLEX is a purely internal manual and as such has no legal force"); see also Newton, 209 F.3d at 459 ("HALLEX does not carry the authority of law"). At least one court from within the Fourth Circuit has adopted the Ninth Circuit's approach. See Melvin v. Astrue, 602 F.Supp.2d 694, 704-705 (E.D.N.C. 2009) (citing Moore, "the court rejects claimant's reliance on the ALJ's alleged failure to comply with HALLEX 1-5-4-66.").

Even if a violation of HALLEX constitutes reversible error, the undersigned Magistrate Judge finds that the Court need not reach the issue because the ALJ did not violate the HALLEX rules and, in any event, the Plaintiff has failed to demonstrate prejudice warranting reversal and remand. First, the ALJ did not violate the HALLEX manual's directions because he did not attempt to interpret the "raw" test data obtained by Dr. Joseph when she administered the MMPI-2. The ALJ's opinion states that Dr. Joseph "reported that the MMPI testing was not valid due to the validity scales, indicating a significant degree of symptom magnification." (R. at 14) The ALJ's statement in this regard is merely a restatement of the validity summary provided by Dr. Joseph, who listed the validity scale scores and stated that the MMPI-2's results "were not considered to be valid." (R. at 687) The ALJ made no effort to obtain the underlying questions and answer sheets that formed the basis of Dr. Joseph's opinion, and in fact agreed with Dr. Joseph that the results were invalid. Second, the Plaintiff has failed to demonstrate prejudice constituting reversible error because the ALJ did not discount Dr. Joseph's opinion solely on the basis of the invalid MMPI-2 scores; the ALJ also cited the findings and conclusions from the Plaintiff's previous disability determination,[7] the opinions of Dr. Roman and Dr. Kuzniar, the opinion of Dr. Sullivan, and other discrepancies between Dr. Joseph's report and her PRTF. (R. at 14, 17, 687)

## E.     The ALJ Provided Sufficiently Specific Reasons in His Decision As to Why the Plaintiff

---

[7] The ALJ's statement on page 17 of the record that the medical evidence "does not show any significant deterioration in functioning since the prior decision" indicates that he considered the prior record in weighing the evidence in the current disability claim, which is sufficient evidence for this Court to determine that the ALJ properly complied with AR 00-1(4). See Allen v. Astrue, 5:09CV81, 2010 WL 2196530, at *4 (N.D.W.Va. May 28, 2010).

**Failed to Meet Listing 12.04C by Incorporating the Prior Decision Into His Opinion and Weighing the Impact of New Evidence On That Decision**

As her third assignment of error, the Plaintiff argues that the ALJ failed to comply with the minimum explanation requirements articulated by the Fourth Circuit in Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986). (Pl.'s Supp. Br. 14, ECF No. 11). In response, the Defendant believes that the ALJ properly supported his conclusion that Listing 12.04C was not credible by providing specific references to the evidence upon which his conclusion is based. (Def.'s Mem. 20-21, ECF No. 22)

When evaluating whether a claimant meets the listed impairments, the Fourth Circuit has determined that an ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). This duty of explanation is satisfied when the ALJ provides findings and determinations sufficiently articulated to permit meaningful judicial review. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

The Plaintiff contends that the ALJ failed to meet this minimum duty of explanation, but this contention is incorrect because it ignores the detailed examination of Listing 12.04C conducted by the ALJ in the Plaintiff's prior disability determination. The ALJ incorporated into the current decision the findings and conclusions made in the Plaintiff's previous disability determination, including specific findings on Listing 12.04C that were affirmed by the district court on review. See Lilly v. Astrue, 5:07CV77, 2008 WL 4371499 (N.D.W.Va. Sept. 22, 2008). In the current decision, the ALJ determined that "the medical evidence of record does not show any significant deterioration

in her functioning since the prior decision." (R. at 17)  The ALJ further stated that, consequently, there was "no evidence establishing the 'C' criteria of the respective listings, as assessed in the prior decision."  Id.  This determination was supported by the ALJ's statement of the weight given to the opinions of Drs. Roman, Kuzniar, and Joseph,  Id.  Therefore, the undersigned Magistrate Judge finds that the ALJ properly explained why the Plaintiff failed to meet Listing 12.04C.

**F.      Substantial Evidence Supports the ALJ's Determination That the Plaintiff's Bladder Condition Was Not Severe**

As her fourth assignment of error, the Plaintiff argues that the ALJ erred in not finding her bladder condition severe.  (Pl.'s Supp. Br. 14-15, ECF No. 11)  In support, the Plaintiff cites evidence from the record indicating that she was instructed to self-catheterize four times per day, that she did not want to catheterize for the rest of her life, that she was recommended for a bladder stimulation implant, and that she explained the difficulties of catheterization and the problems she had with employment to the ALJ.  Id.  In response, the Defendant argues that the medical evidence of record and the Plaintiff's testimony at the ALJ hearing show that her condition had no more than a minimal impact on her ability to work and did not significantly limit her ability to perform basic work activities for twelve consecutive months.  (Defendant's Memorandum in Support 21-24, ECF No. 22)  Additionally, the Plaintiff failed to seek treatment with Dr. Zaslau for the corrective bladder procedure as advised, undermining the credibility of her claim that the condition is severe.  (Def.'s Mem. 24)

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities.  20

C.F.R. § 404.1520(c) (2010). Any impairment must result from abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508 (2010). Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509 (2010). "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

The Plaintiff alleges that her bladder condition requires her to catheterize four times per day and that the process is so time-consuming that it interferes with her ability to perform basic work functions. (Pl.'s Supp. Br. 14-15) However, substantial evidence in the record directly contradicts both of these assertions and supports the decision of the ALJ. First, both Dr. Martinez and Dr. Demby reported that the Plaintiff's bladder and urethra were normal; a cytoscopy performed by Dr. Martinez revealed a normal appearing bladder neck and a normal bladder without mucosal lesions or stones, and Dr. Demby reported that the Plaintiff's urethra and bladder were both normal. (R. at 722, 729) Second, Dr. Martinez, who prescribed the catheters to the Plaintiff, did so for intermittent use only, and there is no indication in the Plaintiff's medical records that any physician instructed her to catheterize four times per day, or even instructed her to catheterize "regularly" as alleged in the Plaintiff's brief. (R. at 723) Third, Dr. Martinez's records indicate that the Plaintiff's problem with her bladder primarily occurs prior to her bedtime, so the majority of the Plaintiff's catheterization would not interfere with her work duties. Id. Fourth, the Plaintiff was recommended to receive a bladder implant which would have allowed her to empty her bladder, alleviating the

condition altogether.  Id.    Fifth, the Plaintiff admitted in her testimony before the ALJ that catheterization sometimes takes only a few minutes, that she has only had one bladder infection since beginning catheterization, and that this infection was successfully treated with oral antibiotics. (R. at 35, 38-39)  In fact, the only person that indicated that the Plaintiff's bladder condition is severe was the Plaintiff herself, whose credibility was discounted by the ALJ due in large part to "significant secondary gain motivation to exaggerate her symptoms in order to obtain disability payments."[8]  (R. at 15)  Accordingly, the undersigned Magistrate Judge finds that substantial evidence supports the ALJ's conclusion that the Plaintiff's bladder condition is not severe because it would have only a minimal impact on her ability to perform basic work functions.

**G.     The Appeals Council Correctly Determined that the Medical Evidence Submitted Regarding the Use of a Catheter Was Not New and Material Information Providing a Basis for Changing the ALJ Decision**

As her final assignment of error, the Plaintiff argues that the Appeals Council erred in determining that the additional evidence submitted did not provide a basis for reviewing the ALJ's decision finding that the Plaintiff was not disabled.  (Pl.'s Supp. Br. 15, ECF No. 11)  The Defendant does not directly address this issue in his brief, but states that the Plaintiff is, in essence, asking this Court to re-weigh the evidence in the case and reach a different conclusion at step two of the sequential evaluation process.  (Defendant's Memorandum in Support 24, ECF No. 22)

The Appeals Council must consider evidence submitted with the request for review in

---

[8] The Court notes that the Plaintiff has not challenged the ALJ's determination as to the Plaintiff's credibility and thus deems the issue to be waived.  See Moseley v. Branker, 550 F.3d 312, 325 n.7 (4th Cir. 2008) ("As a general rule, arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed waived.").

deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." <u>Wilkins v. Sec'y, Dep't of Health and Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991) (citing <u>Williams v. Sullivan</u>, 905 F.2d 214, 216 (8th Cir. 1990)); <u>see also</u> 20 C.F.R. § 404.970 (2010). Evidence is new if it is not duplicative or cumulative. <u>Id.</u> Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. <u>Wilkins v. Sec'y, Dep't of Health and Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991).

The evidence submitted by the Plaintiff to the Appeals Council consisted of the following records:

- Medical evidence from Urologic – Surgical Associates of Charleston, dated May 24, 2007 (treatment records of Dr. Martinez);

- Ultrasound report from Dr. Given, dated May 12, 2008;

- Medical records from Dr. Demby, dated October 17, 2007;

- Medical records from Dr. Pearson, dated June 15, 2008, through May 16, 2008;

- Medical records from Dr. Goad, dated October 22, 2008 through October 21, 2008;

- Medical records from Dr. Given, dated July 22, 2009 through December 2, 2008;

- Lab report from Braxton County Memorial Hospital, dated August 19, 2009;

- Medical evidence from Braxton County Memorial Hospital & Dr. Given, dated January 28, 2010 through September 29, 2009.

(R. at 4) The records submitted relate to the Plaintiff's bladder condition, constipation and rectal bleeding, a skin lesion, chest pain and hypertension, and a sore on her tailbone. (R. at 722-816)

At the outset, the Court finds that, of the additional records submitted by the Plaintiff, only

the records of Dr. Martinez and Dr. Demby relate to the relevant time period because the remainder of the evidence documents medical conditions that arose after December 31, 2007. As to the records of Dr. Martinez and Dr. Demby, the Court finds that they are not "new and material" within the meaning of the Social Security regulations because other evidence in the record specifically addresses these issues, and none of the material submitted would have changed the outcome. First, there are ample treatment records from Dr. Given that give not only his own diagnosis of the Plaintiff's urinary and bladder conditions, but also the Plaintiff's own statements as to her symptoms and the treatments received from Dr. Martinez and Dr. Demby. (See R. at 521-636) Second, the Plaintiff testified at the ALJ hearing about her bladder and urinary problems, including testimony about the explanations given to her by the doctors and the treatment instructions she received . (See R. at 38) Third, these records are not material to the ALJ's decision because the treatment records of Dr. Demby and Dr. Martinez provided diagnoses and recommendations that are much less severe than those recorded by Dr. Given or testified to by the Plaintiff. (See R. at 38, 722-723, 727-731) Accordingly, the undersigned Magistrate Judge finds that the Appeals Council did not err in denying review of the ALJ decision because the evidence presented to the Appeals Council by the Plaintiff was either cumulative, irrelevant, or would not have affected the ALJ's decision.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's application for Supplemental Security Income. Accordingly, I recommend that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 21) be **GRANTED**, and the Decision of the

Administrative Law Judge be **AFFIRMED** because:

1.      substantial evidence supports the ALJ's decision to discount the opinion of Dr. Joseph and rely on the opinions of the State agency psychologists because Dr. Joseph's opinion is inconsistent with her objective findings and other psychological evidence in the record;

2.      the ALJ was not required to call a medical expert to determine that the Plaintiff's MMPI-2 results were invalid because he did not request or interpret the underlying "raw" test data;

3.      the ALJ provided sufficiently specific reasons in his decision as to why the Plaintiff failed to meet Listing 12.04C by incorporating the prior decision into his opinion and weighing the impact of new evidence on that decision;

4.      substantial evidence supports the ALJ's determination that the Plaintiff's bladder condition was not severe; and

5.      the Appeals Council correctly determined that the medical evidence submitted regarding the use of a catheter was not new and material information providing a basis for changing the ALJ decision.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert.</u> <u>denied</u>, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **13th** day of

**December**, **2010**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE